IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

STEVEN J. HARGROVE,                 )
                                    )
                    Plaintiff,      )
                                    )
v.                                  )       Civil Action No. 1:18cv0187 (JFA)
                                    )
NANCY A. BERRYHILL,                 )
*Commissioner of Social Security*,  )
                                    )
                    Defendant.      )
_____)

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment (Docket nos. 15,

19). Plaintiff seeks judicial review of the final decision of Nancy A. Berryhill, Commissioner of

the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act. The Commissioner's final

decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council

for the Office of Disability Adjudication and Review ("Appeals Council") that plaintiff was not

disabled as defined by the Social Security Act and applicable regulations.[1]

On June 4, 2018, plaintiff filed a motion for summary judgment (Docket no. 15) and a

memorandum in support (Docket no. 16). On June 25, 2018, the Commissioner submitted a

cross-motion for summary judgment (Docket no. 19) and a memorandum in support (Docket no.

20). Plaintiff submitted his reply brief on July 5, 2018. (Docket no. 23). For the reasons set

forth below, plaintiff's motion for summary judgment (Docket no. 15) will be denied; the

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 9). In accordance with these rules, this opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

Commissioner's motion for summary judgment (Docket no. 19) will be granted; and the final decision of the Commissioner will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff applied for DIB on October 3, 2012, with an alleged onset date of August 1, 2011. (AR 227). The Social Security Administration denied plaintiff's claims initially on May 22, 2013 (AR 89–101), and on reconsideration on April 25, 2014 (AR 103–18). After these notices of denial, on May 15, 2014, plaintiff requested a hearing before an ALJ. (AR 138–39). On August 8, 2014, the Office of Disability Adjudication and Review ("ODAR") acknowledged plaintiff's request for hearing and notified plaintiff of the option to hold the hearing by video conference (AR 140–46), which plaintiff objected to on October 17, 2014 (AR 147–49). On May 4, 2016, ODAR notified plaintiff that a hearing was scheduled for June 22, 2016. (AR 191–210).

On June 22, 2016, ALJ Michael A. Krasnow held a hearing in Washington, D.C., and plaintiff appeared with his representative, Andrew G. Mathis.[2] (AR 38–88). On August 1, 2016, the ALJ issued a decision denying plaintiff's claims for disability under the Social Security Act. (AR 13–36). In reaching his decision, the ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2015. (AR 31). On August 31, 2016, plaintiff's representative sent a letter to the Appeals Council requesting a review of the ALJ's decision. (AR 10–12). On August 7, 2017, the Appeals Council granted plaintiff's request for review. (AR 223–26). The Notice of Appeals Council Action states that the ALJ made an error of law in finding that March 31, 2015 was the date last insured and that the correct date was December 31, 2015. (Id.). The Notice also states that the Appeals Council plans to make a decision affirming the ALJ's decision that the plaintiff is not disabled through

---

[2] Plaintiff appointed Mr. Mathis as his representative on June 11, 2013. (AR 37).

the December 31, 2015 date last insured because the medical evidence of record shows no significant changes in plaintiff's medical condition between March 31, 2015 and December 31, 2015. (*Id.*). Plaintiff was given an opportunity to provide a statement about the facts and law in the case or submit additional evidence. (*Id.*). Plaintiff submitted a statement to the Appeals Council on August 15, 2017. (AR 314–15). On December 21, 2017, the Appeals Council issued a decision concluding that the medical evidence showed no significant change in plaintiff's condition between March 31, 2015 and December 31, 2015, and adopting the ALJ's statements and finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2015. (AR 1–7). As a result, the decision rendered by the Appeals Council became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On February 20, 2018, plaintiff filed a complaint in the U.S. District Court for the Eastern District of Virginia, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket no. 13). This case is now before the court on the parties' cross-motions for summary judgment (Docket nos. 15, 19).

## II.    STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The duty to resolve conflicts in the evidence rests with the ALJ, not the reviewing court, and the ALJ's decision must be sustained if it is supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### III. FACTUAL BACKGROUND

#### A. Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1959 (AR 227) and was 56 years old at the time of the ALJ hearing (AR 41). Plaintiff testified that he graduated from high school and stated during a medical examination that he attended one year of college. (AR 43, 774). Plaintiff served in the Navy from 1979 to 1981. (AR 773). From 1999 to 2004, in 2007, and in 2010, plaintiff worked at Access Worldwide Communications Inc. as a manager. (AR 44, 233–35). In 1999, plaintiff also worked at BGS Telemarketing Inc. and HR Logic Easy Staff Inc. (AR 233). Plaintiff also worked at WFI Stadium Inc. in 2001, Roberts Oxygen Company Inc. from 2005 to 2006 where he delivered oxygen tanks, and at Central Parking Corporation from 2007 to 2008 as a parking attendant where he attended to and moved cars in a commercial garage. (AR 45–46, 233–34). Plaintiff then worked from home following a heart attack with Tele TechAtHome Inc. from 2010 to 2013. (AR 49, 235). In 2013, plaintiff also worked at Town Park as a car jockey. (AR 50, 235). During a visit to the VA Medical Center on May 1, 2013, plaintiff stated that he was "getting ready to start fulltime work as a concierge in a hotel at the convention center." (AR 751). Plaintiff also worked at Home Depot USA Inc. in 2014 where he assisted customers on the floor. (AR 43, 235–36). Plaintiff testified that he left his job at Home Depot and stopped

4

working because he had "so many issues" that he "wasn't really picking up the training." (AR 43). The ALJ found that even though plaintiff reported earnings in 2011, 2012, 2013, and 2014, those earnings did not rise to the level of substantial gainful activity, and therefore plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 1, 2011. (AR 18). The Appeals Council reviewed plaintiff's earnings record and found that plaintiff's date last insured was December 31, 2015. (AR 224).

## B. Summary of Plaintiff's Medical History Prior to Alleged Disability Date[3]

While the undersigned would normally provide a summary of the entirety of plaintiff's medical history contained in the Administrative Record, the issue related to the cross-motions for summary judgment focuses on three of the severe impairments identified in the ALJ's decision: (1) lumbar degenerative disc disease, (2) bilateral knee degenerative joint disease, and (3) status post-total right knee replacement. (Docket no. 16 at 5 (citing AR 18)). Accordingly, this summary will focus on those impairments.

In 2005, plaintiff underwent knee repair surgery, and in 2007 or 2008, plaintiff underwent a total right knee replacement. (AR 722, 773, 786). On March 8, 2011, plaintiff presented at Mount Vernon Rehabilitation Medicine Associates and was found to have mild swelling in his joints, wrists, elbows, and knees. (AR 369). Dr. Stephanie Giorlando concluded that plaintiff had chronic pain requiring medication. (Id.). On April 5, 2011, plaintiff returned complaining of knee pain, right knee swelling, and left knee weakness. (AR 368). During the examination, plaintiff stated that he wanted to coach basketball. (Id.). Dr. Giorlando found that plaintiff's right knee had mild warmth and no instability, while his left knee also had mild warmth, a full range of motion, and no instability. (Id.). Dr. Giorlando concluded that plaintiff was probable

---

[3] The Administrative Record contains over 550 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his claims and is not intended to be an exhaustive list of each and every medical treatment.

5

for rheumatoid arthritis or osteoarthritis in his right knee, had advancing osteoarthritis in his left knee, and could use a compressive brace along with medication to address the issue. (*Id.*). On April 29, 2011, plaintiff returned wearing a right knee brace, complaining of left knee pain particularly during bad weather. (AR 367). Dr. Giorlando found that plaintiff's knees had mild distortion and landmarks, and renewed his pain medication. (*Id.*). On May 27, 2011, plaintiff returned complaining of stress at home. (AR 366). Plaintiff was wearing a left knee sleeve and stated that he hoped to start refereeing basketball games on a monthly basis. (*Id.*). Dr. Giorlando found that plaintiff was suffering from chronic osteoarthritic pain and renewed his pain medication, and found that plaintiff could stand on resilient surfaces despite his total knee replacement. (*Id.*).

On June 10, 2011, plaintiff arrived at AAR Alexandria Imaging Center for x-rays of his hands and knees. (AR 316–19). An x-ray of his right knee showed no acute complication following his total knee replacement, an unremarkable bone interface, and no loose body or other abnormalities, but showed calcification in the quadriceps tendon near its insertion onto the patella and a 5 mm spur off of the patella. (AR 318). An x-ray of his left knee was unremarkable, with Dr. William Dunwoody III finding that the patellofemoral joint space was not narrowed, but that there was a 4 mm spur at the insertion of the quadriceps tendon on the superior patella, and an unfused center of ossification in the tibial apophysis. (AR 319). Dr. Dunwoody III concluded that the x-ray revealed no significant arthritis. (*Id.*).

On June 15, 2011, plaintiff returned to Mount Vernon Rehabilitation Medicine Associates. (AR 365). Plaintiff stated that he was getting away on a trip, applying for a job, and had started refereeing basketball games. (*Id.*). Dr. Giorlando observed mild swelling in plaintiff's right knee, noted that plaintiff had a minimum antalgic gait, and found that plaintiff

had osteoarthritis and possible rheumatoid arthritis in his right knee with ongoing pain, for which she renewed his pain medication. (*Id.*). Dr. Giorlando stated that the ultimate goal was to taper the dosage of plaintiff's pain medication. (*Id.*). On July 14, 2011, plaintiff returned complaining of arthritic pain in his knees and other joints. (AR 364). Dr. Margaret Graynovsky noted that plaintiff was still working as a referee and suggested pain management to treat his chronic knee pain, which she attributed to rheumatoid arthritis. (*Id.*).

### C. Summary of Plaintiff's Medical History Following His Alleged Disability Date (August 1, 2011)

On August 11, 2011, plaintiff returned to Mount Vernon Rehabilitation Medicine Associates for a follow-up regarding his chronic knee pain. (AR 363). Plaintiff stated that he was experiencing "clicking and clacking" in his knees every morning. (*Id.*). Dr. Graynovsky noted that plaintiff had a reciprocal gait and found that plaintiff had chronic knee pain as a result of rheumatoid arthritis, and prescribed methadone for pain management. (*Id.*).

On August 23, 2011, plaintiff presented at the INOVA Alexandria Hospital complaining of seizures and respiratory failure. (AR 330, 380). During the examination, Dr. Juliette Wohlrab noted that plaintiff had chronic knee pain and a right knee scar. (AR 331). A physical examination found that his lower extremities were normal. (AR 381). Plaintiff was discharged on August 26, 2018 in stable condition and it was noted that he has chronic pain syndrome and was continued on methadone. (AR 377).

On September 9, 2011, plaintiff returned to Mount Vernon Rehabilitation Medicine Associates following the seizure he had at home and hospitalization. (AR 362). Dr. Giorlando noted that plaintiff had a full active range of motion in his lower extremities and a non-antalgic gait, but that his knees had a bit of swelling. (*Id.*). Dr. Giorlando found that plaintiff had diffuse osteoarthritis with possible autoimmune arthritis and renewed his pain medication while noting

her concern that his seizures may have been influenced by the pain medication. (*Id.*). On October 6, 2011, plaintiff returned and reported his treatment for neurological conditions. (AR 361).[4] Dr. Giorlando noted that he was "comfortable" and had no lower-extremity swelling, but found osteoarthritic changes in plaintiff's hands and hips, for which she renewed his pain medication. (*Id.*). On November 3, 2011, plaintiff returned for a follow-up and stated that he had no sensitivity and was tolerating activities well. (AR 360). Dr. Giorlando again found that plaintiff had chronic pain stemming from osteoarthritis and/or rheumatoid arthritis and renewed his pain medication, and proposed setting up a new pain medication strategy. (*Id.*).

On September 28, 2012, plaintiff presented to the INOVA Alexandria Hospital complaining of back pain. (AR 375). Images of the thoracic spine showed that there were no compression fractures or subluxation, but that there was minimal narrowing of the disc space diffusely with small to moderate sized endplate osteophytes. (*Id.*). The treating physician concluded that there was no evidence of acute abnormality, though there was mild spondylosis. (*Id.*).

On January 13, 2013, plaintiff was admitted to INOVA Alexandria Hospital following a cardiac arrest. (AR 503–681). On January 21, 2013, plaintiff received an implantable cardioverter defibrillator ("ICD"). (AR 548–49). During this hospitalization plaintiff was taken off methadone and put on fentanyl for chronic pain. (AR 504). Plaintiff was discharged on January 25, 2013 in stable condition to follow up with specialists. (*Id.*).

On February 15, 2013, plaintiff returned to INOVA Alexandria Hospital complaining of an exacerbation of his chronic pain. (AR 495). Plaintiff had been prescribed 100 mg Fentanyl patches, and complained of difficulty sleeping, body aches, and fatigue after running out of the medication. (*Id.*). A physical examination found that plaintiff's lower extremities had a normal

---

[4] The MRI of plaintiff's brain performed on September 30, 2011 was unremarkable. (AR 341–42).

range of motion and intact sensation, though plaintiff complained of stiffness in all of his joints. (AR 496–97). Plaintiff was discharged home with a prescription refill. (AR 495).

On March 4, 2013, plaintiff appeared at the VA Medical Center in order to establish care. (AR 772). Plaintiff stated that he had been prescribed methadone for 3 years to treat chronic joint pain before switching to Fentanyl. (AR 772–73). The treating physician noted that while plaintiff characterized his joint pain as "rheumatoid arthritis," he was never treated for it. (AR 774–75). An imaging examination of plaintiff's knees found that his total right knee replacement appeared stable, while his left knee showed mild to moderate degenerative changes with joint space narrowing. (AR 779). The physician further noted that neither side showed a fracture, and the soft tissues appeared normal. (*Id.*). Plaintiff returned for a follow-up on March 6, 2013, during which Dr. Melissa Turner informed him that his blood work and radiology studies suggested degenerative joint disease rather than rheumatoid arthritis in his knees. (AR 771–72).

On March 27, 2013, plaintiff appeared at Virginia Heart for a follow-up regarding his ICD implant. (AR 694). During the follow-up, plaintiff's extremities and back were noted as having "[n]ormal muscle strength and tone." (AR 695). On April 3, 2013, plaintiff returned to the VA Medical Center for a follow-up appointment. (AR 754–55). During the examination, plaintiff stated that he was ready to start coaching youth basketball again and the pain intensity score for his knee was recorded as a 3. (AR 755, 757). On May 1, 2013, plaintiff returned for a follow-up appointment. (AR 754). During the examination, plaintiff stated that he had pain in his hands and knees rated at a 4 on a scale out of 10, and expressed his desire to taper his dose of Fentanyl. (AR 751, 754). Plaintiff stated that the pain control was good and that he was getting ready to start fulltime work as a concierge in a hotel. (AR 751).

As a part of the review of his disability claim, plaintiff underwent x-rays of his hands and knees on May 2, 2013. (AR 706–20). An x-ray of his left knee showed that there was no fracture and the joint alignment was well maintained, but there was mild degenerative osteophytosis of the tibial spines. (AR 707). An x-ray of his right knee showed that the metal components of plaintiff's total knee prosthesis were in good position, there was soft tissue calcification including the quadriceps tendon attachment, and there was a small joint effusion, but there was no acute fracture or acute process. (AR 716). Images of the lumbar spine showed dextroscoliosis involving the lumbar spine and mild degenerative changes. (AR 719).

On May 4, 2013, plaintiff appeared at C.E. Provider Services for a medical evaluation by Dr. Jong Park. (AR 721–27). Dr. Park noted plaintiff was on a variety of medications, including a 150 mg dosage of Fentanyl as needed. (AR 722). Plaintiff stated that he had been out of work since 2011 and that his typical daily activities consisted of doing things around the house. (AR 722–23). Plaintiff also stated that he had functional limitations of sitting for 30–40 minutes, standing 5–10 minutes, walking 1–2 blocks and lifting/carrying 5 pounds repetitively and 10 pounds occasionally. (AR 723). Dr. Park noted that plaintiff did not come with an assistive device and he had a symmetric, steady gait. (AR 724). Dr. Park found that plaintiff had normal muscle strength, no palpable muscle spasms, no joint swelling, and a normal range of motion, but had tenderness over the bilateral knees. (AR 724–26). Dr. Park also observed that plaintiff was able to lift, carry, and handle light objects; rise from a sitting position without assistance but had with some difficulty getting up and down from the exam table; walk on heels and toes with moderate difficulty; tandem walk normally and hop on either foot bilaterally; and dress and undress adequately; but he was unable to squat and rise from that position. (AR 725). Plaintiff's range of motion was found to be normal in all respects. (AR 725–26). Dr. Park concluded that

due to plaintiff's knee pain, which he believed was the result of degenerative arthritis and not rheumatoid arthritis, he had moderate limitations in ambulation and long standing, that he could be expected to sit normally in an eight-hour workday with normal breaks, stand at least 1–2 hours and walk 1 hour at a time in an eight-hour workday before requiring a break. (AR 727). Dr. Park further found that plaintiff did not require an assistive device with regards to short and long distances and uneven terrain, could be expected to lift and carry at least 20 pounds frequently and 40 pounds occasionally, could bend and stoop frequently, but could crouch and squat only occasionally. (*Id.*). Dr. Park stated that there were no manipulative or work place environmental limitations. (*Id.*).

On May 29, 2013, plaintiff spoke with Dr. Turner at the VA Medical Center and stated that he had transitioned to a lower dose of Fentanyl and was working again, which helped to distract him from thinking about pain. (AR 748). On August 25, 2013, plaintiff emailed Dr. Turner regarding a refill of his Fentanyl prescription, stating that is feeling better but he still feels "a little pain" if he walks "a block or so" when walking his dog. (AR 745). Plaintiff stated that he believed the pain was caused by a pulled muscle in his back, but that his back was better and he has "moving around well." (*Id.*). On November 29, 2013, plaintiff returned for a follow-up appointment and discussed further tapering his dose of pain medication. (AR 738–39). During that visit it was noted that plaintiff had lost weight, his joints were not painful, he was doing well, and in very little pain. (AR 739–40).

On April 5, 2014, plaintiff returned to C.E. Provider Services, LLC for a medical examination by Dr. Walid Chalhoub. (AR 785–91). Plaintiff stated that he had a history of osteoarthritis affecting his bilateral knees and thumb joints; his symptoms included pain, heat, stiffness, swelling, and locking, and were exacerbated by physical activity and improved with

stretching; and had a pain intensity of 7–8 on a scale out of 10 most days, affecting his ability to work secondary to difficulty with standing, walking, crouching, and lifting. (AR 785). Plaintiff stated that he had been out of work since 2012 and that his typical daily activities consisted of doing things around the house. (AR 787). Plaintiff stated that he had functional limitations of sitting for 10–15 minutes, standing 10–15 minutes, walking 1 block, and lifting/carrying 5 pounds repetitively and 10 pounds occasionally due to arthritis and shortness of breath. (*Id.*). Dr. Chalhoub noted that plaintiff did not come with an assistive device and that plaintiff had a symmetric but slow and limping gait. (AR 788). Dr. Chalhoub found that plaintiff had normal muscle strength except for some weakness in his left and right leg flexion and extension; and that plaintiff's range of motion was normal except for limitations in the left and right MCP flexion, flexion-CMC thumb, knee flexion, plantar flexion, ankle/foot eversion, and ankle/foot inversion. (AR 788–90). Dr. Chalhoub also found that plaintiff had tenderness and deformity in his bilateral knees; was able to lift, carry, and handle light objects; was able to rise from a sitting position without assistance but had difficulty in getting up and down from the exam table; was able to walk on heels and toes; and could dress and undress well; but had abnormal tandem walking and could not stand on either foot bilaterally; and was unable to squat and rise from that position. (AR 789). Dr. Chalhoub concluded that due to plaintiff's knee pain, he had diminished strength in both bilateral extremities, but could be expected to sit normally in an eight-hour workday with normal breaks, stand at least 1 hour, and walk 45–60 minutes at a time in an eight-hour workday before requiring a break and 2–3 hours total in an 8 hour workday. (AR 791). Dr. Chalhoub further found that plaintiff would benefit from an assistive device with regards to long distances and uneven terrain, could be expected to lift and carry at least 25 pounds frequently and 50 pounds occasionally, could bend and stoop occasionally, but could not

crouch and squat. (*Id.*). Dr. Chalhoub found no manipulative limitations, but stated there may be some environmental limitations due to his seizure disorder. (*Id.*).

On July 18, 2014, plaintiff presented at the National Spine & Pain Center for imaging of his foot and knees. (AR 812–14). A CT scan of plaintiff's right knee found that his total knee replacement was without identifiable complications. (AR 813). An x-ray of plaintiff's left knee found no fracture or destructive process, but found moderate joint space narrowing in the medial compartment, mild joint space narrowing in the patellofemoral compartment, mild degenerative spurring at the joint margins, and no joint effusion. (AR 814). The impression from this x-ray was that plaintiff had bicompartmental osteoarthritis in his left knee. (*Id.*). On November 11, 2015, plaintiff presented at the INOVA Alexandria Hospital for a bone/joint scan. (AR 878). In reviewing the results from this scan, Dr. Nitin Kumar found fairly pronounced polyarthropathy involving plaintiff's hands, wrists, and knees which was most likely due to multifocal osteoarthritis. (AR 879).[5]

On May 19, 2016, Dr. George Silis, plaintiff's primary care provider since 2005, submitted a letter regarding plaintiff's health. (AR 823). Dr. Silis stated that plaintiff had been diagnosed with intervertebral disc disorder, osteoarthritis of the shoulder and bilateral knees, seizure disorder, chronic pain syndrome, memory loss, history of pulmonary embolism, trigger finger, residual muscle weakness, hypertension, and plantar fasciitis. (*Id.*). Dr. Silis concluded that plaintiff was permanently disabled and that his prognosis was fair. (*Id.*). The Administrative Record contains 28 pages of medical records from Franconia Internists and Dr. Silis. (AR 461–88). Those records reflect treatment from January 19, 2011 (AR 480) through

---

[5] After the last insured date of December 31, 2015, plaintiff appeared at the INOVA Alexandria hospital on March 4, 2016, complaining of memory loss. (AR 833). During the examination, Dr. Lewis Eberly noted that plaintiff's motor strength was intact in all extremities with normal tone and bulk, and that there was normal movement of all extremities. (AR 834).

13

December 20, 2012 (AR 461). According to those records, Dr. Silis' examinations of the plaintiff were primarily for hypertension and chronic pain syndrome for which Dr. Silis prescribed medication. (AR 461–88). There are no treatment notes from Dr. Silis following plaintiff's establishment of care from the VA Medical Center in early 2013.

On June 17, 2016, Dr. Cherrick submitted a medical source statement opining that plaintiff had chronic joint pain in the knees due to polyarthritis. (AR 888). Dr. Cherrick stated that medication management had improved the pain. (*Id.*). Dr. Cherrick also stated that plaintiff had several physical limitations, including that he could sit for less than 2 hours in an eight-hour workday; stand/walk for less than 2 hours in an eight-hour workday; required a cane as an ambulatory aid; was prevented from sitting upright for six of eight hours in a work setting; could sit for 30 minutes at most; and would never be able to stoop, bend, squat, or kneel. (AR 888–90). Dr. Cherrick also opined that plaintiff was incapable of tolerating even low-stress jobs, rated plaintiff's pain at a 7–8 on a scale out of 10, and stated that plaintiff's disability was not likely to change. (AR 890–91). The medical records in the Administrative Record from Dr. Cherrick and National Spine & Pain Center (AR 794–822) indicate that treatment began on July 3, 2014 (AR 815), x-rays and a CT were taken on August 7, 2014 (AR 812–14), the results were reviewed on August 7, 2014 (AR 806), an MRI of plaintiff's lumbar region was ordered on August 13, 2014 (AR 805), an MRI was performed on March 11, 2015 (AR 800), x-rays and a CT were taken on April 25, 2016 (AR 795–99), and during an office visit on April 27, 2016 it was noted that a nuclear bone scan would be obtained (AR 794).

### D. The ALJ's Decision on July 27, 2016

Determining whether an individual is eligible for disability insurance benefits requires the ALJ to employ a five-step sequential evaluation. The court examines this process to determine whether the correct legal standards were applied and whether the ALJ's final decision

is supported by substantial evidence. *See* 20 C.F.R. § 404.1520. Specifically, the ALJ must consider whether a plaintiff: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether plaintiff can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. When considering a claim for DIB, the ALJ must also determine whether the insured status requirements of sections 261(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a plaintiff has a disability. *See* 20 C.F.R. § 404.1520(a)(3).

Here, the ALJ made the following findings of fact: (1) plaintiff last met the insured status requirements of the Social Security Act on March 31, 2015; (2) plaintiff did not engage in substantial gainful activity during the period from the alleged onset date of August 1, 2011 through his date last insured of March 31, 2015; (3) through the date last insured, plaintiff had the following severe impairments: lumbar degenerative disc disease, bilateral knee degenerative joint disease, status-post total right knee replacement, bilateral hand degenerative joint disease, recurrent arrhythmias, cardiomyopathy, and status-post ICD placement; (4) through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (5) through the date last insured, plaintiff had the residual functional capacity to perform light work, except he could never climb ladders, ropes, or scaffolds, he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stars, he was limited to

frequent handling bilaterally, and he needed to avoid even moderate exposure to hazards, such as dangerous moving machinery. (AR 18–28). The ALJ then found: (6) through the date last insured, plaintiff was capable of performing past relevant work as a customer service representative and customer service manager, which did not require the performance of work-related activities precluded by plaintiff's residual functional capacity; and (7) plaintiff was not under a disability, as defined by the Social Security Act, at any time from August 1, 2011, the alleged onset date, through March 31, 2015, the date last insured. (AR 28–31).

On August 7, 2017, the Appeals Council agreed to review the ALJ's decision, finding that plaintiff had sufficient credits of coverage to remain insured through December 31, 2015, not March 31, 2015 as the ALJ previously found. (AR 4, 224). The Appeals Council determined that the evidence in the record showed no significant changes in plaintiff's medical condition between March 31, 2015 through December 31, 2015 that would warrant any change in the ALJ's decision. (AR 5). Accordingly, the Appeals Council adopted the ALJ's findings but corrected the date last insured from March 31, 2015 to December 31, 2015, ultimately concluding that plaintiff was not under a disability, as defined by the Social Security Act, at any time from August 1, 2011, the alleged onset date, through December 31, 2015, the corrected date last insured. (AR 5–6).

## IV.    ANALYSIS

### A.    Overview

Plaintiff's motion for summary judgment argues that the ALJ improperly evaluated his severe impairments during Step 3 of the sequential evaluation process. (Docket no. 16 at 5–12). Plaintiff argues that: (1) he put forth sufficient evidence to demonstrate that his impairments met or equaled Listing 1.02(A) due to his inability to ambulate effectively, and (2) the ALJ failed to properly evaluate whether plaintiff's impairment met or equaled Listing 1.02(A). (Docket no. 16

at 5–12). In response, the Commissioner argues that: (1) plaintiff failed to meet his burden of proving that he met the criteria of a listed impairment at Step 3 of the sequential evaluation process, and (2) the ALJ properly considered the evidence in the record and explained his weighing of that evidence. (Docket no. 20 at 19–28).

## B. Substantial Evidence Supports the ALJ's Determination at Step 3 that Plaintiff Did Not Meet or Equal the Criteria of Listing 1.02

The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only considered to be disabled "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). The Social Security Act defines "disability" through a case-by-case, functional inquiry into the effects physical or mental impairments have on a claimant's ability to function in the workplace. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990). The claimant bears the burden of providing medical and other evidence to establish a disability at Step 3 of the sequential evaluation process. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). An impairment must meet all of the specified medical criteria in a listing, as an impairment that "manifests only some of [the] criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

To establish disability under Listing 1.02(A), defined as a "[m]ajor dysfunction of a joint(s)," a claimant must establish a:

> gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, subpt. P, app. 1, § 1.02(A). The "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. § 404, subpt. P, app. 1, § 1.00(B)(2)(b)(1). In order to ambulate effectively:

> [A claimant] must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § 404, subpt. P, app. 1, § 1.00(B)(2)(b)(2).

Plaintiff first contends that he set forth sufficient evidence to demonstrate that his impairments met or equaled Listing 1.02(A). (Docket no. 16 at 7–10). In making this argument, plaintiff relies on the following evidence in the record:

- Plaintiff's total right knee replacement surgery in 2007

- Dr. Giorlando's notes regarding plaintiff's osteoarthritis and chronic knee pain from 2011 (AR 361–69)

- spinal x-rays showing narrowing disc space and degenerative changes (AR 375, 719)

- knee x-rays showing joint space narrowing and degenerative changes (AR 707, 796)

- Dr. Park's examination of plaintiff on May 4, 2013 (AR 721–27)

- Dr. Chalhoub's examination of plaintiff on April 5, 2014 (AR 785–91)

(Docket no. 16 at 7–8). Plaintiff argues that this evidence supports not only a finding that he has a gross anatomical deformity involving a major peripheral weight-bearing joint but also a finding that he has an inability to ambulate effectively, particularly given Dr. Chalhoub's findings that plaintiff "would benefit from an assistive device with regards to long distances and uneven terrain," and that plaintiff was limited to walking 45–60 minutes at a time. (Docket no. 16 at 10 (citing AR 791)).

In response, the Commissioner argues that plaintiff has not demonstrated that he met all of the criteria in Listing 1.02(A). (Docket no. 20 at 20–24). The Commissioner argues that the evidence in the record identified by plaintiff may support the claim that he has some limitation of the ability to walk, but it does not support the claim that he had an "extreme" limitation of the ability to walk. (Docket no. 20 at 20–24). For example, Dr. Chalhoub found that plaintiff had "deformity" in his knees rather than "gross anatomical deformity," plaintiff stated to Dr. Giorlando during several of his visits that he intended to referee basketball monthly and tolerated daily activities well, and was found to have a normal range of motion by Dr. Giorlando. (Docket

no. 20 at 21–23). The Commissioner also identified additional evidence in the record supporting her argument that plaintiff did not meet the requirement in Listing 1.02(A), including visits to the VA Medical Center where plaintiff was observed to have a normal gait and was tapering his pain medication. (Docket no. 20 at 22).

Plaintiff's second argument follows from his first argument. Plaintiff argues that while the ALJ mentioned Listing 1.02(A), the ALJ made his own "medical conclusion" based on an incorrect legal standard that would require that plaintiff to establish that he needed a cane to perform his activities of daily living. (Docket no. 16 at 10-11). Plaintiff also argues that the ALJ did not specifically discredit Dr. Chalhoub's opinion regarding plaintiff's ability to ambulate. In response, the Commissioner argues that the ALJ properly considered Dr. Chalhoub's opinions and adequately explained why he found those findings to be "overstated." (Docket no. 20 at 24– 28). In particular, the ALJ found that Dr. Chalhoub's opined restrictions were only partially consistent with the record and would therefore only be entitled to partial weight, and then explained why those restrictions overstated plaintiff's walking and standing limitations as reflected in the record. (Docket no. 20 at 24–25 (citing AR 27)).[6]

Judicial review of an ALJ's decision "is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). In rendering a decision, an ALJ has the duty to "analyze all of the relevant evidence and to provide a sufficient explanation for [his] rationale in crediting certain evidence." *Bill Branch Coal Corp. v. Sparks*, 213 F.3d 186, 190 (4th Cir. 2000) (internal citation omitted). Remand may be necessary upon an "ALJ's failure to make requisite findings or to articulate the bases for his conclusions." *DeLoatche*, 715 F.2d at 150.

---

[6] The ALJ's decision addresses plaintiff's medical treatment in the section concerning the Listings (AR 20–21) and the following section concerning plaintiff's residual functional capacity (AR 21–28). The ALJ references the longitudinal treatment history in the RFC analysis in the section addressing the Listings. (AR 20).

As an initial matter, plaintiff mischaracterizes the ALJ's finding at Step 3 in arguing that the ALJ effectively required that plaintiff need a cane to perform his activities of daily living to meet the Listing 1.02 standard. At Step 3, the ALJ discussed the standard set by Listing 1.02 and then determined: "the claimant's musculoskeletal impairments do not meet or equal the criteria of Listing 1.02. The objective evidence simply fails to indicate that the claimant had functional loss based on a musculoskeletal impairment as required by the Listing. Specifically, his treatment findings were unremarkable; his [sic] was able to perform his activities of daily living and work; and, he engaged in hobbies and social activities where he ambulated without the use of an assistive device." (AR 20). Plaintiff's assertion that this determination is akin to requiring that he use a cane to perform his activities of daily living to meet the Listing 1.02 is inaccurate on its face.

Plaintiff next relies on *Robinson v. Colvin*, a case decided in the Western District of Virginia, in arguing that the ALJ not only applied an incorrect legal standard and failed to take relevant evidence into account, but also failed to adequately explain the bases for his decision at Step 3. (Docket no. 16 at 11–12). In *Robinson*, the ALJ determined that the plaintiff was not disabled at Step 3 under Listing 1.02(A). *Robinson v. Colvin*, 2014 WL 1276507, at *4 (W.D. Va. Mar. 27, 2014). The court determined that the ALJ "did not expressly discuss" relevant medical evidence that ran contrary to the ALJ's determination and remanded the matter, finding that the medical evidence "ought to have been specifically considered by the ALJ." *Id.* The court noted that remand was proper even if the ignored medical evidence did not change the ALJ's decision. *Id.*

In this case, and unlike in *Robinson*, the ALJ considered all the relevant medical evidence, including evidence that ran contrary to his determination at Step 3. Plaintiff

recognizes that the ALJ considered Dr. Chalhoub's opinion regarding plaintiff's ability to ambulate and determined that Dr. Chalhoub's findings were overstated. (Docket no. 16 at 11–12). Indeed, the ALJ described Dr. Park's and Dr. Chalhoub's findings, including Dr. Chalhoub's finding that plaintiff "would benefit from an assistive device for walking long distances," and determined that the opined restrictions were inconsistent with "the physical examination findings from the consultive examinations," which indicated that plaintiff was "in no acute distress," had "no swelling and/or muscle atrophy," had "full strength," and a "steady gait." (AR 27). The ALJ also found that Dr. Chalhoub's restrictions were not supported by other evidence in the record, including evidence that plaintiff "lived alone with his wife who is mentally and physically disabled, he coached basketball, he walked his dog, and he worked as a concierge at a hotel." (*Id.*). Accordingly, the ALJ not only specifically considered the contrary evidence identified by plaintiff, but he also provided an adequate explanation for his decision to give it partial weight.

Moreover, the substantial evidence, described in detail by the ALJ, supports the ALJ's finding that plaintiff's musculoskeletal impairments did not meet or equal the criteria of Listing 1.02. (*See* AR 20, 22–28). First, plaintiff's stated ability to perform activities of daily living suggests that he did not meet the criteria of Listing 1.02(A). The ALJ noted that plaintiff lived alone with his wife, who is mentally and physically disabled, and last worked at Home Depot in 2014 performing customer service which required being on his feet for the whole day. (AR 22, 43, 235–36, 278). Plaintiff's treatment records and his testimony suggest that he was capable of independently performing activities of daily living, including performing personal care/hygiene, preparing simple meals, going shopping in stores, performing cleaning and housework, driving to run errands or visit family/friends, and managing his own finances. (AR 23, 360–69, 738–55).

22

The treatment notes also indicate that plaintiff was refereeing basketball games, coaching basketball, walking his dog with little pain and no use of a cane, working, and reducing his use of pain medication. (*Id.*).

Second, the objective medical evidence suggests that plaintiff did not meet the criteria of Listing 1.02(A). Courts in this district have found that an "inability to ambulate effectively" as defined by Listing 1.02(A) requires that the claimant be required to use assistive devices that limit the use of both upper extremities. *See Hamm v. Colvin*, 2015 WL 165302, at \*13 n.7 (E.D. Va. Jan. 12, 2015) ("Examples of ineffective ambulation include the inability to: walk without a walker, two crutches, or two canes . . . ."); *Masha v. Astrue*, 2010 WL 6802749, at \*6 (E.D. Va. Nov. 19, 2010) ("[T]he use of a cane alone is insufficient to meet [Listing 1.02(A)]."), *adopted by*, 2011 WL 2471537 (E.D. Va. June 21, 2011). In this case, the evidence indicates that plaintiff walked with a steady, non-antalgic gait, did not require the use of an assistive device, had normal muscle strength, and a normal range of motion. For example, plaintiff underwent bilateral knee imaging in June 2011 and May 2013 which revealed a stable total right knee replacement, mild patellar tendonitis of the right knee, and a generally normal left knee with mild degeneration, but no significant arthritis. (AR 24, 318–19, 707, 716, 813–14). Moreover, plaintiff received intermittent treatment for his knees and hands, and the majority of those visits were devoted to pain management. (AR 24, 360–69, 738–78). During the vast majority of his visits to medical providers, plaintiff appeared in no acute distress, had no active musculoskeletal symptoms, and had a full range of motion/strength in his upper and lower extremities. (AR 24–25, 360–69, 496–97, 738–78). The medical findings from plaintiff's consultive examinations with Drs. Park and Chalhoub were also consistent with the medical record, and further demonstrate that plaintiff did not require a more limiting assistive device: Dr. Park opined that

plaintiff did not require an assistive device for short and long distances and uneven terrain, while Dr. Chalhoub merely opined that plaintiff "would benefit" from—rather than "required"—an assistive device for long distances. (AR 26, 721–27, 785–91).

Plaintiff's function reports and testimony also indicate that he did not require the use of an assistive device, much less one that limited the use of both upper extremities. In his function reported dated January 26, 2013, plaintiff indicated that he walked his dog, went grocery shopping, and stated that he used a sling, but did not use crutches, a cane, a walker, a wheelchair, or any other assistive devices. (AR 248–55). Plaintiff's function reported dated January 25, 2014 similarly stated that while plaintiff used a heart monitor, pacemaker, and defibrillator, he did not use crutches, a cane, a walker, a wheelchair, or any other assistive devices. (AR 274). During the June 22, 2016 hearing, plaintiff testified that he walked with a cane, but did not state that he used any other assistive devices in order to walk. (AR 55). At the very most, plaintiff's evidence would support a finding that plaintiff has used a single cane, not an assistive device that limits the functioning of both upper extremities. Thus, a review of the relevant objective and subjective evidence demonstrates that substantial evidence supports the ALJ's finding that plaintiff's musculoskeletal impairments did not meet or equal the criteria of Listing 1.02. Moreover, the ALJ's decision makes clear that plaintiff did not carry his burden in proving that his impairments met or equaled the criteria of Listing 1.02 and adequately articulates the bases for his conclusion. Accordingly, the plaintiff failed to carry his burden, the ALJ provided a sufficient record for judicial review to justify his rationale in crediting certain evidence and articulated the bases for his determination at Step 3 that plaintiff did not meet or equal the criteria of Listing 1.02, and the ALJ's determination is supported by substantial evidence.

## V. CONCLUSION

Based on the foregoing, the court finds that the Commissioner's final decision denying benefits for the period of August 1, 2011 through December 31, 2015, is supported by substantial evidence and that the proper legal standards were applied in evaluating the evidence. Accordingly, plaintiff's motion for summary judgment (Docket no. 15) will be denied; the Commissioner's motion for summary judgment (Docket no. 19) will be granted; and the final decision of the Commissioner will be affirmed.

Entered this 6th day of August, 2018.

_____/s/_____
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia